UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———————————

GFR, LTD.,

        Plaintiff,                         Case No.  1:18-CV-238

v.                                         HON. GORDON J. QUIST

MARK FARNER,

        Defendant.

_____/

## OPINION

      Plaintiff, GFR, Limited, sued Defendant, Mark Farner, the former lead singer and lead guitarist for the Flint, Michigan-based classic-rock band, Grand Funk Railroad, alleging claims of trademark infringement, in violation of the Lanham Act, 15 U.S.C. §§ 1114 and 1125(a); trademark dilution, in violation of 15 U.S.C. § 1125(c); and common law unfair competition.  GFR also requests cancellation of Farner's registered mark MARK FARNER'S AMERICAN BAND, Registration No. 5,413,822.[1]  In particular, GFR—which owns the Grand Funk trademarks and is owned by original Grand Funk members, Farner, Don Brewer, and Mel Schacher—alleges that Farner has infringed and continues to infringe GFR's mark THE AMERICAN BAND.  GFR further alleges that Farner violated a stipulated permanent injunction entered in a prior lawsuit between the parties that governs Farner's use of the words GRAND FUNK and GRAND FUNK RAILROAD. Farner filed an answer and a counterclaim.

      GFR has filed a motion pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b) to dismiss Farner's counterclaim for cancellation of GFR's trademark THE AMERICAN BAND,

---

[1]GFR also initially sued Farner's booking agent, Just Having Fun Productions, Inc.  On June 21, 2018, the parties stipulated to dismiss Just Having Fun Productions, Inc., leaving Farner as the only Defendant in this case.  (ECF No. 15.)

which alleges that GFR committed fraud on the United States Patent and Trademark Office. (ECF No. 18.) GFR also filed a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56(a) on Farner's counterclaim. (ECF No. 40.) This motion is based on Farner's failure to identify evidence or witnesses in his Rule 26(a) disclosures to support the fraud claim. Finally, GFR moves for a preliminary injunction seeking to enjoin Farner from using the words AMERICAN BAND in interstate commerce. (ECF No. 21.)

For the following reasons, the Court will grant GFR's motion to dismiss, deny its motion for summary judgment as moot, and deny GFR's motion for a preliminary injunction.

## I. BACKGROUND

Grand Funk Railroad (also referred to herein as GFR) is a well-known rock-band that was formed in Flint, Michigan, in 1969. Grand Funk's original members were lead guitarist and lead singer Mark Farner, drummer Don Brewer, and bassist Mel Schacher. Grand Funk has toured throughout the world and has sold millions of records, including numerous "Gold" and "Platinum" albums. Grand Funk had two Billboard number one million-selling singles, "We're An American Band" and "Locomotion," and several top forty singles, including "I'm Your Captain (Closer To Home)," "Bad Time," and "Some Kind of Wonderful," most of them produced in the early to mid-1970s. (ECF No. 1 at PageID. 3.)

As is often the case with rock bands that achieve immense success, disagreements and infighting between the band members ultimately led to a breakup. In 1983, Farner left the band to pursue a solo career. (*Id.*) The original band members reunited in 1996 to perform a number of shows, but Farner permanently left in 1998. Grand Funk continues to tour with two of its original members, Brewer and Schacher, as well as others, and Farner continues to perform with his own band. (*Id.*)

GFR owns a number of federally-registered trademarks, including GRAND FUNK RAILROAD , Registration No. 1,936,824; THE AMERICAN BAND , Registration No. 2,820,656; and GRAND FUNK RAILROAD THE AMERICAN BAND & Design , Registration No. 2,791,528. (*Id.*) This is not the first time GFR and Farner have tangled over GFR's trademarks. In 2003, GFR sued Farner and others in this district over Farner's use of GRAND FUNK RAILROAD and GRAND FUNK. *GFR, Ltd. v. Mark Farner, et al.*, No. 1:03-CV-432 (W.D. Mich.). The parties resolved the lawsuit, in part, through entry of a stipulated Permanent Injunction, which specified the circumstances under which Farner was entitled to use the words "Grand Funk Railroad" and "Grand Funk" as part of the billing for his personal performances. (Case No. 1:03-CV-432, ECF No. 46.)

On February 27, 2018, the United States Patent and Trademark Office (USPTO) issued Registration No. 5,413,822 to Farner for the trademark MARK FARNER'S AMERICAN BAND. (ECF No. 1 at pageID.6.) Farner's band performs under the name Mark Farner's American Band. GFR, through counsel, notified Farner his use of GRF's trademarks, including AMERICAN violated both the Preliminary Injunction and federal trademark laws, and demanded that Farner cease the alleged violations, but Farner refused to honor GFR's demand. (*Id.*)

GFR filed its complaint in this case on March 7, 2018, alleging that Farner's use of the GRAND FUNK RAILROAD marks violated the Permanent Injunction and that Farner's use of the mark MARK FARNER'S AMERICAN BAND infringed GFR's rights in its mark THE AMERICAN BAND. Subsequently, and after Farner filed his answer, affirmative defenses, and counterclaim, GFR filed the instant motions.[2]

---

[2]The parties engaged in Voluntary Facilitative Mediation, which was required to conclude no later than October 5, 2018. (ECF No. 27.) However, the mediator reported substantial progress, and the sessions continued for several months after that date. (ECF Nos. 35 and 43.) On December 28, 2018, the mediator notified the Court that mediation was complete. (ECF No. 53.)

## II.  DISCUSSION

### A.    Motion to Dismiss Fraud Counterclaim

GFR argues that Farner's claim for cancellation of the registration for the trademark THE AMERICAN BAND based upon fraud on the USPTO is subject to dismissal because it fails to sufficiently allege the elements of a fraudulent procurement claim, as required by Rule 12(b)(6), and fails to comply with Rule 9(b)'s particularity requirements.

Pursuant to Federal Rule of Civil Procedure 8(a), a complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief."  Detailed factual allegations are not required, but "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 1964–65 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47, 78 S. Ct. 99, 103 (1957)).  The court must accept all of the plaintiff's factual allegations as true and construe the complaint in the light most favorable to the plaintiff.  *Gunasekera v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009).  The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570, 127 S. Ct. at 1974.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009).  Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556, 127 S. Ct. at 1965).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Id.* at 679, 129 S. Ct. at 1950 (quoting Fed. R. Civ. P. 8(a)(2)).

Apart from Rule 8(a)'s pleading requirements, a party asserting fraud "must state with particularity the circumstances constituting fraud," although "intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). "The Sixth Circuit interprets Rule 9(b) as requiring plaintiffs to 'allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud.'" *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 563 (6th Cir. 2003) (quoting *Coffey v. Foamex L.P.*, 2 F.3d 157, 161–62 (6th Cir. 1993)). That is, the plaintiff should "specify the statement [he] contend[s] is fraudulent, identify the speaker, time, and location of the statement, and explain why the statement is indeed untrue or a misrepresentation." *Rautu v. U.S. Bank*, 557 F. App'x 411, 414 (6th Cir. 2014) (citing *Frank v. Dana Corp.*, 547 F.3d 564, 570 (6th Cir. 2008)).

Section 38 of the Lanham Act provides:

> Any person who shall procure registration in the Patent and Trademark Office of a mark by a false or fraudulent declaration or representation, oral or in writing, or by any false means, shall be liable in a civil action by any person injured thereby for any damages sustained in consequence thereof.

15 U.S.C. § 1120. To allege a claim for fraudulent procurement of a trademark registration, a plaintiff must allege: (1) a false or fraudulent representation of a material fact by the applicant in connection with obtaining the trademark; (2) knowledge that the representation was false; (3) the defendant's intent to induce the USPTO to rely on the misrepresentation; (4) reasonable reliance by the USPTO on the misrepresentation; and (5) damages proximately caused by the defendant's misrepresentation. *Jaguar Land Rover Ltd. v. Bombardier Recreational Prods., Inc.*, 2017 WL 2472851, at *2 (E.D. Mich. June 8, 2017) (citing *FD9 Grp., Inc. v. Bangle Jangle, LLC*, No. CV1500512-BRO-ASX, 2015 WL 12776584, at *5 (C.D. Cal. May 13, 2015)); *see also Dial-A-Mattress Operating Corp. v. Mattress Madness, Inc.*, 841 F. Supp. 1339, 1353 (E.D.N.Y. 1994)

(noting a party seeking cancellation of a trademark based on fraud must demonstrate: (1) a false representation regarding a material fact; (2) knowledge or belief that the representation is false; (3) an intention to induce the listener to rely on the misrepresentation; (4) reasonable reliance on the misrepresentation; and (5) damage proximately resulting from such reliance) (citing 3 J. Thomas McCarthy, *Trademarks and Unfair Competition* § 31.21(2)(a), at 31:96 (3d ed. 1992)).

In his counterclaim for fraudulent procurement of THE AMERICAN BAND trademark, Farner alleges, in relevant part:

> 3. Counterdefendant has fraudulently procured a trademark registration for THE AMERICAN BAND. Counterdefendant does not perform under that name, and it knew it did not perform under that name when the registration was applied for. Counterdefendant typically performs under the name GRAND FUNK RAILROAD or GRAND FUNK.

> 4. Upon information and belief, Counterdefendants' THE AMERICAN BAND registration was procured in bad faith and is based upon a fraud on the trademark office, and for anticompetitive purposes in keeping Counterclaimant from pursuing his livelihood.

(ECF No. 9 at PageID.36.)

GFR argues that Farner's fraud claim falls short of Rule 9(b)'s requirements because Farner does not identify with particularity the false representation in GFR's trademark application. GFR further notes that Farner does not even mention, let alone allege, facts that performing under a name other than THE AMERICAN BAND was material to the USPTO's decision to allow the registration or that the USPTO would not have issued the registration had it known that GFR performed under the names "Grand Funk Railroad" or "Grand Funk" and not "The American Band."

Farner responds that he has sufficiently, and with particularity, pled the elements of his fraudulent procurement claim. That is, he argues, his claim identifies the time, place, and content of the false statement. Farner argues that GFR misrepresented in its application that the band performs under the name "The American Band" and that GFR made the misrepresentation to the

USPTO when it submitted its application. Farner further argues that he pled scienter because GFR knew it did not perform under that name, and he pled materiality because GFR applied for the mark on the basis of "use in commerce," and any representation regarding use of the mark would be material. Finally, Farner argues that he sufficiently pled reliance by the USPTO because if his allegation is true—that GFR did not perform under the name "The American Band"—reliance is established because the USPTO would have had no basis to issue GFR the trademark because GFR had not used the name in commerce.

Farner's fraudulent procurement claim fails from the outset because nothing in GFR's application can be arguably interpreted as representing that GFR performs under the name "The American Band." Rather, the application requested registration "in connection with the following services: ENTERTAINMENT SERVICES IN THE FORM OF PERFORMANCES BY A VOCAL AND INSTRUMENTAL GROUP." (ECF No. 30-1 at PageID.169.) Farner cites no authority for the proposition that a Class 41 registration for entertainment services requires that the applicant perform under the asserted trademark. Here, GFR sought registration of its mark "in connection with" the provision of entertainment services, which in no way suggests that GFR actually performed under the name "The American Band." As GFR notes in its reply, numerous professional sports teams own trademarks used in connection with entertainment services that are not their performance names. For example, Detroit Red Wings, Inc. owns the registration for RED WINGS, Registration No. 0893051, for entertainment services, as well as the registration for HOCKEYTOWN, Registration No. 2167939, for entertainment services. Similarly, the Boston Red Sox Baseball Club Limited Partnership owns the registration for RED SOX, Registration No. 1095475, for entertainment services, as well as the registration for GREEN MONSTER, Registration No. 3607649, for entertainment services. As can be seen, there is no requirement that an applicant

actually performs under a mark used in connection with the provision of entertainment services.

Although Farner requests leave to amend and a "court should freely give leave [to amend] when justice so requires," Fed. R. Civ. P. 15(a)(2), "[a] court need not grant leave to amend . . . where amendment would be 'futile.'" *Miller v. Calhoun Cnty.*, 408 F.3d 803, 817 (6th Cir. 2005) (quoting *Foman v. Davis*, 371 U.S. 178, 182, 83 S. Ct. 227, 230 (1962). Amendment would be futile if the proposed amendment would not survive a motion to dismiss. *SFS Check, LLC v. First Bank of Del.*, 774 F.3d 351, 355 (6th Cir. 2014). Here, there is little question that amendment would be futile. Farner's fraud claim is based solely on GFR's trademark application, and the Court has already concluded that GFR did not misrepresent to the USPTO that it used THE AMERICAN BAND in connection with providing entertainment services. Farner does not indicate how an amendment would cure the defect in his claim, and the Court finds no basis to believe that an amendment would do so.

Because the Court concludes that Farner fails to state a claim for fraudulent procurement of the trademark from the USPTO and that amendment will not cure the pleading deficiency, the Court need not consider GFR's motion for summary judgment.

## B. Motion for Preliminary Injunction

GFR moves for a preliminary injunction precluding Farner from continuing to use GFR's trademark in interstate commerce. Although GFR includes a request in its brief that the Court craft a preliminary injunction to prohibit Farner from also violating the Permanent Injunction with regard to the GRAND FUNK marks, the Court will limit the scope of GFR's motion to the mark THE AMERICAN BAND because GFR refers only to AMERICAN BAND in the conclusion of its brief and the Permanent Injunction already governs Farner's use of the GRAND FUNK marks.

"A preliminary injunction is an extraordinary remedy never awarded as a matter of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24, 129 S. Ct. 365, 376 (2008). A court

should grant an injunction "only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).

A court considers four factors in deciding whether to issue a preliminary injunction: (1) whether the plaintiff has shown a strong likelihood of success on the merits; (2) whether the plaintiff would suffer irreparable injury absent an injunction; (3) whether granting an injunction will cause substantial harm to others; and (4) whether issuance of an injunction is in the public interest. *Rock & Roll Hall of Fame & Museum, Inc. v. Gentile Prods.*, 134 F.3d 749, 753 (6th Cir. 1998). These are factors to be balanced, not prerequisites that must be met. *See Washington v. Reno*, 35 F.3d 1093, 1099 (6th Cir. 1994). A district court need not make specific findings on each of the four factors if fewer factors are dispositive of the issue. *See In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985). Nonetheless, "it is generally useful for the district court to analyze all four of the preliminary injunction factors." *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007) (internal quotation marks omitted). In a trademark case, injunctive relief may be granted if the plaintiff shows irreparable harm and either: (1) likelihood of success on the merits; or (2) "sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Frisch's Rests., Inc. v. Elby's Big Boy of Steubinville, Inc.*, 670 F.2d 642, 651 (6th Cir. 1982) (citation omitted).

## 1.    Likelihood of Success on the Merits

GFR alleges claims of trademark infringement under 15 U.S.C. § 1114 and unfair competition under 15 U.S.C. § 1125. "The touchstone of liability under § 1114 is whether the defendant's use of the disputed mark is likely to cause confusion among consumers regarding the

origin of the goods offered by the parties."[3]  *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 280 (6th Cir. 1997).  The same is true of claims under § 1125. *Champions Golf Club, Inc. v. The Champions Golf Club, Inc.*, 78 F.3d 1111, 1123 (6th Cir. 1996). This requires "more than the theoretical possibility of confusion."  *Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Winship Green Nursing Ctr.*, 103 F.3d 196, 200 (1st Cir. 1996). The similarity between marks "must be such as would cause confusion of any appreciable number of ordinarily prudent purchasers as to the source of the goods."  *West Point Mfg. Co. v. Detroit Stamping Co.*, 222 F.2d 581, 590 n.2 (6th Cir. 1955) (internal quotation marks omitted).

The Sixth Circuit has identified the following eight factors to assess whether there is a likelihood of confusion: (1) strength of the plaintiff's mark; (2) relatedness of the goods or services; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchaser care and sophistication; (7) the defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines using the marks.  *See Frisch's Rest., Inc. v. Shoney's Inc.*, 759 F.2d 1261, 1264 (6th Cir. 1984).  "Not all of these factors will be relevant in every case, and in the course of applying them, the ultimate question remains whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way." *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 630 (6th Cir. 2002) (brackets and internal quotation marks omitted).

### A.      Strength of GFR's Mark

The strength of the mark inquiry "focuses on the distinctiveness of a mark and its recognition among the public."  *Id.*, at 631.  In general, "[t]he stronger the mark, the more likely it is that

---

[3]Because the parties do not dispute that GFR's mark is protectable, the Court proceeds to the second step of the infringement analysis—"whether relevant consumers are likely to confuse the sources of the parties' products." *Kibler v. Hall*. 843 F.3d 1068, 1073 (6th Cir. 2016).

encroachment on it will produce confusion. Accordingly, the strong mark enjoys greater protection while the weak mark is afforded little support." *Champions Golf Club, Inc. v. The Champions Golf Club, Inc.*, 78 F.3d 1111, 1117 (6th Cir. 1996) (citation and internal quotation marks omitted).

A mark's strength consists of two components—conceptual strength and commercial strength—which provide independent measures. *Kibler v. Hall*, 843 F.3d 1068, 1073 (6th Cir. 2016). Conceptual strength, which measures the distinctiveness of the mark, places it into one of four categories along a spectrum: generic, descriptive, suggestive, and fanciful or arbitrary. *Therma-Scan*, 295 F.3d at 631. On one end of the spectrum, generic marks, which simply name the particular good or service, *i.e.*, a chair, are the weakest type of mark and cannot become a trademark. *Champions Golf Club*, 78 F.3d at 1117. On the other end of the spectrum, fanciful or arbitrary marks are considered the strongest or most distinctive marks and the most worthy of protection. *Little Caesar Enters., Inc. v. Pizza Caesar, Inc.*, 834 F.2d 568, 571 (6th Cir. 1987). Arbitrary marks have "a significance recognized in everyday life, but the thing it normally signifies is unrelated to the product or service to which the mark is attached." *Id.* Oft-cited examples include Camel cigarettes and Apple computers. *Id.* In between are descriptive marks, which "specifically describe[] a characteristic or ingredient of an article," *Progressive Distrib. Servs., Inc. v. United Parcel Serv., Inc.*, 856 F.3d 416, 428 (6th Cir. 2017) (internal quotation marks omitted), and suggestive marks, which suggest "an ingredient or characteristic of the goods and requires the observer or listener to use imagination and perception to determine the nature of the goods." *Champions Golf Club*, 78 F.3d at 1117 (internal quotation marks omitted). Citibank, which indicates a bank located in an urban area, is an example of a suggestive mark. *Id.* Marks that are solely descriptive can be protected only if the mark has acquired secondary meaning, while suggestive marks, which are stronger, do not require proof of secondary meaning. *Id.*

Commercial strength measures "public recognition, or the extent to which people associate the mark with the product it announces." *Progressive Distrib. Servs.*, 856 F.3d at 430. A plaintiff may establish commercial strength in several ways. Consumer surveys are "the most persuasive evidence of commercial recognition," but are "by no means a requirement." *Id.* Other types of evidence relevant to commercial strength include direct consumer testimony; exclusivity, length, and manner of use; amount and manner of advertising; and amount of sales and number of customers. *Herman Miller, Inc. v. Palazzetti Imports & Exports, Inc.*, 270 F.3d 298, 311–12 (6th Cir. 2001).

GFR argues that its mark is strong because THE AMERICAN BAND is a famous mark, it has used the mark for over 45 years, the song and album "We're an American Band" has been heard in numerous venues around the world and heard by millions, and the mark is deemed incontestable. Farner counters that the mark is weak because THE AMERICAN BAND is merely descriptive and not famous. Farner further argues that GFR has presented no evidence of commercial strength and other musicians' use of the phrase "The American Band" has weakened GFR's mark.

Initially, while the Court has no doubt that GFR's GRAND FUNK marks are famous, the Court is not prepared at this juncture—without an evidentiary basis—to conclude that THE AMERICAN BAND is a famous mark. *See Big Boy Rests. v. Cadillac Coffee Co.*, 238 F. Supp. 2d 866, 871 (E.D. Mich. 2002). GFR's "We're an American Band" album and song no doubt had tremendous success and fame. But GFR always performed under "Grand Funk" or "Grand Funk Railroad," not "The American Band," and always included THE AMERICAN BAND as a slogan in connection with the GRAND FUNK marks. (ECF No. 31-1 at PageID.207.) GFR may well eventually prove that THE AMERICAN BAND is famous, but that is an issue for another day with a more developed record.

12

Turning to conceptual strength, GFR does not dispute Farner's argument that THE AMERICAN BAND is conceptually weak because it is merely descriptive—it describes what Grand Funk Railroad is: a band from America. GFR, however, notes that its mark is incontestable.[4] Such a mark "is presumed to be at least descriptive with secondary meaning, and therefore a relatively strong mark." *Daddy's Junky Music Stores*, 109 F.3d at 282 (internal quotation marks omitted). Because Farner does not dispute that the mark is incontestable, a presumption arises that THE AMERICAN BAND is conceptually strong. *See Jet, Inc. v. Sewage Aeration Sys.*, 165 F.3d 419, 422 (6th Cir. 1999) (noting that when a mark has attained incontestable status, a presumption of strength applies, and "an infringement action may not be defended on the grounds that [the] mark is merely descriptive") (brackets and internal quotation marks omitted). The presumption, however, may be rebutted by evidence showing that the mark is, in fact, weak. *Progressive Distrib.*, 856 F.3d at 429. Rebuttal evidence may include "extensive third party use of similar marks." *Id.* (internal quotation marks omitted).

As noted, Farner contends that third-party use has weakened GFR's mark. Farner cites three examples of such use. First, Farner notes that a symphonic band composed of musicians from Rhode Island, Connecticut, and Massachusetts has used the name "The American Band" continuously dating back to 1837. (ECF No. 31-3 at PageID.246.) The band's website states that "[o]ur repertoire is both versatile and traditional with works ranging from classical to popular operatic overtures to modern works for band." (*Id.*) Second, Farner points to a rock band from Virginia that existed for a short time from 1968–69, called "The American Band," that produced music that was not "hard rock and . . . not quite psychedelic." (*Id.* at PageID.250.) Finally, Farner

---

[4]A mark is deemed incontestable if it has been in continuous use for five consecutive years after registration and has not been successfully challenged. 15 U.S.C. § 1065.

points out that the country rock group the "Drive By Truckers" released an album in 2016 titled "American Band." (*Id.* at pageID.260–88.)

The Sixth Circuit has observed that no "specific number of third-party uses" are required to show that a mark has been weakened. *Progressive Distrib.*, 856 F.3d at 429. Instead, "context matters." *Id.* In the Court's judgment, Farner's few examples of third-party use are not enough to undermine the presumption of strength GFR's mark has obtained from its incontestable status. First, although the Northeast-based symphonic band has used the name "The American Band" substantially longer than GFR and also produces music, Grand Funk and the symphonic band produce different styles and types of music, use completely different instruments (electric guitars, keyboards, and drums versus brass and woodwind instruments), and are dissimilar in size and performance characteristics. There is little chance that the symphonic band's use of the name would weaken GFR's mark because any consumer of music would know that the two bands are unrelated. Moreover, there is no indication that the symphonic band has achieved substantial recognition outside of the Northeast United States, as GFR has. Second, the 1960s Virginia-based rock band had one obscure album and broke up several years before Grand Funk produced "We're an American Band" and many years before GFR began to use THE AMERICAN BAND mark. This third-party use that ceased decades ago is unlikely to weaken GFR's mark. Finally, the "Drive By Truckers'" use of "American Band" is simply the name of an album produced by a separately-identifiable band that plays a different style of rock music. In short, while Farner has shown some third-party uses of "American Band," his evidence does not constitute evidence of "extensive third-party use" that has weakened GFR's incontestable mark. *AutoZone, Inc. v. Tandy corp.*, 373 F.3d 786, 794 (6th Cir. 2004).

As for commercial strength, GFR has not presented a consumer survey or evidence regarding the amount it has spent to advertise or promote its mark. However, GFR's use of the mark for over

14

20 years, in combination with the success of the "We're an American Band" album and song from which the mark was derived, is some evidence of commercial strength. In addition, the third-party uses Farner cites do not detract from the mark's commercial strength.

In light of the foregoing, GFR has shown that its mark is strong, which supports a finding of likelihood of confusion.

### B.     Relatedness of Goods & Services

The Sixth Circuit has adopted three "benchmarks" for applying this factor. "First, if the parties compete directly, confusion is likely if the marks are sufficiently similar; second, if the goods and services are somewhat related, but not competitive, then the likelihood of confusion will turn on other factors; finally, if the products are unrelated, confusion is highly unlikely." *Kellogg Co. v. Toucan Golf, Inc.*, 337 F.3d 616, 624 (6th Cir. 2003). "The relatedness inquiry therefore focuses on whether goods or services with comparable marks that are similarly marketed and appeal to common customers are likely to lead consumers to believe that they come from the same source, or are somehow connected with or sponsored by a common company." *Therma-Scan*, 295 F.3d at 633 (internal quotation mark omitted). However, goods and services are not necessarily related "simply because they coexist in the same broad industry." *Id.* (internal quotation marks omitted).

GFR argues that this factor strongly favors GFR because the parties compete directly by promoting and performing live music. Farner argues that the parties goods and services are not necessarily related because GFR uses THE AMERICAN BAND only as a slogan to identify Grand Funk Railroad, while MARK FARNER'S AMERICAN BAND is the actual mark under which Farner provides services.

On one hand, the parties' services are directly related because they both provide live performances of the same type of music, which would generally be described as rock and roll or

classic rock and roll.  On the other hand, as discussed *infra*, Farner has shown that the parties perform in different types of venues that may draw different types of customers or fans.  At this point, the record contains scant evidence about the parties' respective customers, or whether the parties cater to the same customers at all.  *See Echo Drain v. Newsted*, 307 F. Supp. 2d 1116, 1125 (C.D. Cal. 2003) (concluding that bands that performed under the names "Echo Drain" and "Echobrain" did not provide related services because they played different types of music and played at different types of clubs that catered to different types of customers).  Accordingly, the Court concludes that this factor is neutral in the analysis.

### C.    Similarity of the Marks

Courts give this factor "considerable weight." *Daddy's Junky Music Stores*, 109 F.3d at 283. In determining similarity, "a court should consider the pronunciation, appearance, and verbal translation of conflicting marks." *Leelanau Wine Cellars, Ltd. v. Black & Red, Inc.*, 502 F.3d 504, 516–17 (6th Cir. 2007) (internal quotation marks omitted).  A court should not limit itself to a side-by-side comparison but instead "must determine, in the light of what occurs in the marketplace, whether the mark 'will be confusing to the public when singly presented.'"  *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1187 (6th Cir. 1988) (quoting *Beer Nuts, Inc. v. Clover Club Foods Co.*, 711 F.2d 934, 941 (10th Cir. 1983)).  "It is the overall impression of the mark, not an individual feature, that counts." *Homeowners Grp., Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1109 (6th Cir. 1991).  When considering similarity, a court must adhere to the "anti-dissection rule": it must view the mark in its totality and not focus on its prominent feature. *Little Caesar Enters., Inc. v. Pizza Caesar, Inc.*, 834 F.2d 568, 571 (6th Cir. 1987) (citing J. Thomas McCarthy, *Trademarks and Unfair Competition* § 23:15 (2d ed. 1984)).  As one court has observed, "Of course, few would be stupid enough to make exact copies of another's mark or symbol.  It has been well said that the

16

most successful form of copying is to employ enough points of similarity to confuse the public with enough points of difference to confuse the courts." *Baker v. Master Printers Union of N.J.*, 34 F. Supp. 808, 811 (D.N.J. 1940).

GFR argues that this factor weighs heavily in favor of a finding of likelihood of confusion because Farner incorporated the entirety of GFR's mark into his mark to market the same musical performance services. GFR argues that the sole alteration, replacing THE with MARK FARNER'S, is an immaterial alteration that does not render confusion less likely. Instead, GFR argues, caselaw holds that the addition of extra words, such as a house mark or a trade name—like Farner's name—does not avoid the likelihood of confusion and may, in fact, exacerbate it.[5] Farner responds that the marks are dissimilar because, while both use the phrase "American Band," that phrase itself is merely descriptive, which renders confusion less likely. Farner adds that there is also an important distinction: GFR's mark contains THE, while Farner has substituted MARK FARNER'S for THE, which creates a different impression.

In terms of pronunciation and appearance, the marks are identical insofar as they both use AMERICAN BAND. But the phrase AMERICAN BAND is merely descriptive, and the inclusion of THE is important to GFR's mark because it conveys the impression that this particular American Band is the official or most prominent American Band, along the same lines that the inclusion of "The" before "Ohio State University" creates the impression that Ohio State is the official or leading university of Ohio. In contrast, the use of MARK FARNER'S before AMERICAN BAND creates the impression that this particular American Band is associated with, owned, and controlled by an

---

[5]GFR argues that given Farner's former association with Grand Funk Railroad, Farner's fan base may reasonably assume that Farner is still associated with Grand Funk Railroad because he is using the American Band name with permission from GFR. In the Court's judgment, this argument goes to the degree of purchaser care factor.

individual, Farner. Farner's mark does not suggest that his band is the official or most prominent American Band.

GFR is correct that many courts have held that the addition of a house mark or trade name to a confusingly similar mark does not alleviate the likelihood of confusion and may, in fact exacerbate confusion. *See Select Auto Imports Inc. v. Yates Select Auto Sales, LLC*, 195 F. Supp. 3d 818, 835 (E.D. Va. 2016) (noting that "[t]he addition of a house mark to one of two otherwise similar marks will not serve to avoid a likelihood of confusion" and that "addition of a house mark can aggravate, rather than mitigate, confusion") (internal quotation marks omitted). But that is not a universal rule. *See Med. Economics Co v. Prescribing Reference, Inc.*, 294 F. Supp 456, 464 (S.D.N.Y. 2003) ("There is conflicting authority as to whether the addition of a house mark eliminates the likelihood that consumers will be confused or may actually serve to aggravate confusion."). In fact, some courts have recognized that in certain circumstances the addition of a house mark can decrease the likelihood of consumer confusion by identifying the source, while in other circumstances the addition of a house mark can exacerbate the potential for confusion. *See Public Impact, LLC v. Boston Consulting Grp., Inc.*, 169 F. Supp. 3d 278, 289 (D. Mass. 2016). According to these courts, whether the likelihood of confusion is alleviated or exacerbated depends on the type of harm. In cases of ordinary confusion, the addition of a house mark "could help diminish the chance of confusion." *Attrezzi, LLC v. Maytag Corp.*, 436 F.3d 32, 39 (1st Cir. 2006) (citing *Pignons S.A. de Mecanique de Precision v. Polaroid Corp.*, 657 F.2d 482, 487 (1st Cir. 1981)). In cases of reverse confusion, the addition of a house mark could aggravate the harm. *Id.* (citing *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 230 (3d Cir. 2000)). Even as to reverse confusion, the Sixth Circuit has not adopted such a rigid rule. Instead, it has observed that "there is no blanket rule for all cases of reverse confusion" and "the only question that

must be answered is whether there is a potential for confusion." *Progressive Distrib.*, 856 F.3d at 433 n.5.

The instant case involves ordinary, not reverse, confusion. Thus, reverse confusion cases are not particularly helpful. Instead, as the Sixth Circuit has observed, the only question is whether there is a potential for confusion. Although MARK FARNER'S is not a house mark or a trade name, the Court concludes that it nonetheless serves to distinguish the marks and lessens the likelihood that relevant consumers will be confused because it lets them know that this is Farner's American Band. *See Duluth News-Tribune, a Div. of Nw. Publ'ns, Inc. v. Mesabi Publ'g Co.*, 84 F.3d 1093, 1097 (8th Cir. 1996) ("The most significant distinction . . . is the defendants' placement of a blue banner reading, "Publication of the Mesabi Daily News, Virginia and Daily Tribune, Hibbing" beneath the title.").[6]

Accordingly, considering each mark as a whole, the Court finds them sufficiently dissimilar, which weighs against a finding of likelihood of confusion.

### D.      Evidence of Actual Confusion

Evidence of actual confusion is the strongest proof of likely consumer confusion, but is not necessary to establish a likelihood of confusion. *Frisch*, 759 F.2d at 1267. As GFR has not presented evidence of actual confusion to support its motion, this factor is not pertinent to the Court's analysis.

### E.      Marketing Channels Used

This factor considers "how and to whom the respective goods or services of the parties are sold." *Leelanau Wine Cellars*, 502 F.3d at 519 (internal quotation marks omitted). "The more

---

[6]In both its opening and reply briefs, GFR referred to and compared the parties' logos but limited its similarity of the marks argument to the mark THE AMERICAN BAND. Farner, therefore, addressed only THE AMERICAN BAND mark in his response. Accordingly, the Court does not address similarities and differences in the parties' logos.

channels and buyers overlap, the greater the likelihood that relevant consumers will confuse the sources of the parties' products." *Kibler*, 843 F.3d at 1079. "There is less likelihood of confusion where the goods are sold through different avenues." *Leelanau Wine Cellars*, 502 F.3d at 519.

GFR argues that this factor weighs strongly in favor of a finding of a likelihood of confusion because the parties not only provide identical services, but they formerly provided such services together. GFR further notes that both GFR and Farner market to identical consumers: fans of the former Grand Funk band seeking current performances and/or licensed merchandise. GFR points out that both parties rely on their respective websites, as well as Facebook and YouTube, to market themselves and their tickets for performances.

Farner argues that the parties use different channels to market their services and appeal to different consumers because they present their respective services in different types of venues. Farner argues that he markets himself to other well-known musical groups with a history of selling tickets in the market in order to perform as their opening acts. Obi Steinman, Farner's manager, states in a declaration that most of Farner's performances are so-called "hard ticket" events, which are standalone shows that include headline groups for whom Farner opens. (ECF No. 31-4 at PageID.295.) Steinman further states that, in contrast, GFR performs in so-called "soft ticket" venues, such as casinos and county fairs, which have built-in audiences and cheap entry or free tickets. (*Id.*)

Based on the current record, the Court concludes that this factor weighs against a finding of likelihood of confusion, or is no more than neutral in the analysis. First, there is little evidence in the record regarding the parties' respective fan-bases. While it could be assumed that GFR and Farner share a common fan-base composed of individuals who followed Grand Funk Railroad during Farner's tenure with the band, such is not necessarily true. Farner last performed with Grand

Funk more than two decades ago, during which time Farner has developed his own solo career, probably with his own fans or following. Second, Farner has presented evidence that the parties perform in different types of venues; there is little indication of overlap in the record. Finally, as for the fact that both parties use the internet to market their services or products, the Sixth Circuit has found that shared use of the internet, by itself, is not enough to suggest likelihood of confusion. A court must consider: (1) whether the parties use the internet as a substantial marketing channel; (2) whether the parties use their marks in connection with web-based products; and (3) whether the parties' marketing channels overlap in other ways. *Kibler*, 843 F.3d at 1068. Other than perhaps the first inquiry, GFR has not addressed the other two factors, and Farner's evidence suggests that there really is not much overlap outside of the internet. Moreover, in *Kibler* the court noted that, given the prevalence of musicians' use of websites and internet-based platforms such as Facebook, Youtube, and Twitter to promote their products, most consumers will be able to distinguish the sources of competing products. *Id.* at 1080 ("At the same time, the popularity of [Facebook, Youtube, and Twitter] makes it that much less likely that consumers will confuse the sources of the parties' products. There are just too many contenders.").

### F.     Likely Degree of Purchaser Care

This factor focuses on whether the "'typical buyer exercising ordinary caution'" will likely be confused as to the source of the defendant's products. *Leelanau Wine Cellars*, 502 F.3d at 519 (quoting *Daddy's Junky Music*, 109 F.3d at 285). However, when the potential consumer has special expertise or is a sophisticated purchaser, or when the good or service is particularly expensive, a higher degree of care will apply. *Id.*; *see also Homeowners Grp., Inc.*, 931 F.2d at 1111.

This factor weighs against a finding of likelihood of confusion. Some concert tickets are very expensive, some are not. But a concert ticket is not an impulse purchase made in the grocery

store checkout aisle.  Because music is intensely a matter of personal taste, a consumer purchasing a concert ticket would likely exercise a high degree of care.

This factor thus weighs strongly against a finding of likelihood of confusion.

### G.    Intent in Selecting the Mark

This factor is relevant if a party chooses a mark with the intent of causing confusion.  If such is the case, that fact by itself may be sufficient to support an inference of confusing similarity.  *Wynn Oil*, 839 F.2d at 1189.  "Direct evidence of intentional copying is not necessary to prove intent." *Daddy's Junky Music Stores*, 109 F.3d at 286.  "Rather, the use of a contested mark with knowledge of the protected mark at issue can support a finding of intentional copying." *Id.*

Given that Farner was clearly aware of GFR's mark when he adopted MARK FARNER'S AMERICAN BAND, such evidence is circumstantial proof of Farner's intent in selecting his mark. Farner explains that he had no intent to trade on GFR's marks because his goal was to distance himself from GFR's GRAND FUNK RAILROAD mark when performing live music.  (ECF No. 31-1 at PageID.208.)  Farner states that he chose MARK FARNER'S AMERICAN BAND because it reflected his personal values and American style of rock and roll.  (*Id.* at PageID.209–10.)  Farner argues that it would make no sense to distance himself from GRAND FUNK RAILROAD and then turn around and trade on GFR's THE AMERICAN BAND mark.

Although Farner's knowledge of GFR's mark could suffice to show intentional infringement, Farner has provided a plausible explanation about why he adopted the mark that undermines a finding of bad intent.  Accordingly, the Court considers this factor neutral.

### H.    Expansion of Product Lines

Neither party presents any evidence that either one will expand its business to compete with the other.  Accordingly, this factor is irrelevant to the analysis.

*Balancing the Factors*

Taking the applicable factors into account, the strength of GFR's mark is the only factor that weighs in favor of a finding of likelihood of confusion. On the other hand, the similarity of the marks, marketing channels used, and likely degree of purchaser care offset the strength of the mark factor. On balance, the Court finds that the pertinent factors weigh against a likelihood of confusion, particularly because a reasonably careful consumer would not be confused by the parties' respective marks, and the degree of care Farner's fans exercise in their purchase of concert tickets is likely higher than that of the typical buyer.

In sum, GFR fails to show a strong likelihood of success that Farner's use of MARK FARNER'S AMERICAN BAND creates a likelihood of confusion among consumers.

## 2. Irreparable Harm

The second preliminary injunction factor GFR must demonstrate is that absent injunctive relief, it will suffer irreparable harm. Cases from the Sixth Circuit have held that a finding of irreparable harm ordinarily flows from a likelihood of confusion. *See Wynn Oil Co.*, 943 F.2d at 608; *DAP Prods., Inc. v. Color Tile Mfg., Inc.*, 821 F. Supp. 488, 493 (S.D. Ohio 1993) ("A presumption of irreparable harm attaches once the moving party demonstrates probable success in proving likelihood of confusion."). No presumption arises, however, because the Court has concluded that GFR failed to show a likelihood of success on the merits. Moreover, as the parties recognize, there is some question as to whether the Supreme Court's decision in *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 126 S. Ct. 1837 (2006), precludes a presumption of irreparable harm in Lanham Act cases. In *eBay*, the district court denied injunctive relief because it found that injunctive relief was unavailable in certain types of patent cases, *id.* at 383, 126 S. Ct. at 1840, but the Federal Circuit reversed, concluding that injunctive relief should normally follow once findings

of validity and infringement have been made. *Id.* at 393–94, 126 S. Ct. at 1841. The Supreme Court concluded that neither court got it right, because they both failed to apply "the traditional four-factor framework that governs the award of injunctive relief." *Id.* at 394, 126 S. Ct. at 1841. In the wake of *eBay*, courts have debated whether its holding—which, in effect, precludes a presumption that equitable relief should issue when infringement is found in a patent case—also applies to trademark cases. The Sixth Circuit has not addressed the issue. The Third and Ninth Circuits have held that a presumption of irreparable harm is not permitted in Lanham Act cases, including for preliminary injunctive relief. *Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 216–17 (3d Cir. 2014); *Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1249–50 (9th Cir. 2013). In addition, although a copyright case, the Second Circuit noted in *Salinger v. Colting*, 607 F.3d 68 (2d Cir. 2010), that "*eBay* strongly indicates that the traditional principles of equity it employed are the presumptive standard for injunctions in any context," including preliminary injunctions. *Id.* at 78; *see also JEG Powersports, LLC v. M & N Dealership VI, LLC*, No. CIV-16-0242-HE, 2017 WL 3976296, at *3 (W.D. Okla. Sept. 8, 2017) ("The general consensus among the courts that have addressed the issue is that the *eBay* analysis extends to trademark/tradename cases."). This Court finds the foregoing cases persuasive and concludes that *eBay* precludes a presumption of irreparable harm in trademark cases. Accordingly, even if the Court had concluded that GFR had established a likelihood of success on the merits—strong or otherwise—GFR would still have to demonstrate irreparable harm.

Irreparable harm "must be imminent, with a substantial threat of impending injury." *McDonald's Corp. v. Burger King Corp.*, 87 F. Supp. 2d 722, 725 (E.D. Mich. 1999) (internal quotation marks and citation omitted). "Mere injuries" will not do, and the harm must not be speculative. *Roden v. Floyd*, No. 2:16-cv-11208, 2018 WL 6816162, at *4 (E.D. Mich. Nov. 13,

2018). Applying these principles, GFR has failed to support its claim of irreparable harm. GFR concedes that it has no evidence of actual confusion, and it provides no evidence of any sort of harm flowing from Farner's use of MARK FARNER'S AMERICAN BAND, such as lost sales or profits. At best, all GFR can offer at this point is speculation of harm, which does not suffice. In short, GFR fails to show an injury that is actual and imminent. Moreover, "a preliminary injunction is an inappropriate remedy where the potential harm to the movant is strictly financial." *Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1382 (6th Cir. 1995) (quoting *Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.*, 875 F.2d 1174, 1179 (5th Cir. 1989)). GFR has not shown an injury, such as the potential for damage to its reputation or loss of control over the quality of its own its music or services, that could not be remedied by an award of damages,. *See PGP, LLC v. TPII, LLC*, 734 F. App'x 330 (6th Cir. 2018).

### 3.    Harm to Others

This factor weighs against granting injunctive relief. The question is whether granting of an injunction will cause harm to others. In the preceding section, the Court concluded that GFR has not shown irreparable harm, and there is no indication that GFR will suffer other harm absent an injunction. An injunction, however, could harm Farner because he might have to cancel already scheduled performances, and he would be required to design and print new promotional materials. In addition, an injunction might also adversely affect third parties, such as promoters and venues, that would have to cancel performances and lose revenue.

### 4.    Public Interest

The final factor considers the effect on the public. GFR argues that an injunction would serve the public interest because it would prevent the public from being deceived or confused. As already indicated, however, there is no evidence that the public is being deceived or confused by

Farner's mark. And, unlike the purchase of a durable product, attending a concert in which Farner performs would not inhibit attending a GFR concert. Thus, the public interest would not be served by granting an injunction.

**5.    Balancing the Factors**

In light of the Court's conclusions set forth above, the preliminary injunction factors weigh strongly against granting GFR the requested injunctive relief.

## III. CONCLUSION

For the foregoing reasons, the Court will grant GFR's motion to dismiss Farner's fraudulent procurement counterclaim, deny GFR's motion for summary judgment on Farner's counterclaim as moot, and deny GFR's motion for a preliminary injunction,.

An Order consistent with this Opinion will enter.


Dated:  March 14, 2019                                  _____/s/ Gordon J. Quist_____
                                                                        GORDON J. QUIST
                                                                        UNITED STATES DISTRICT JUDGE